UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| **ROBERT COLLINS** | **CIVIL ACTION NO. 19-102-P** |
| **VERSUS** | **JUDGE FOOTE** |
| **JAMES LEBLANC, ET AL.** | **MAGISTRATE JUDGE HORNSBY** |

## REPORT AND RECOMMENDATION

In accordance with the standing order of this court, this matter was referred to the undersigned Magistrate Judge for review, report and recommendation.

## STATEMENT OF CLAIM

Before the court is a civil rights complaint filed by pro se plaintiff Robert Collins ("Plaintiff"), pursuant to 42 U.S.C. § 1983. This complaint was filed in the United States District Court for the Middle District of Louisiana on November 6, 2018, and by ordered was transferred and filed in this court on January 29, 2019. Plaintiff is currently incarcerated at the Dixon Correctional Institute but claims his civil rights were violated by prison officials while incarcerated at the David Wade Correctional Center in Homer, Louisiana. He names the Louisiana Department of Public Safety & Corrections, James LeBlanc, the Warden of David Wade Correctional Center, John Bel Edwards, Jerry Goodwin, and Jeffery Bruce Fuller as defendants.

In 2006, Plaintiff was in an auto accident. In 2009, he had back surgery. He claims the doctor recommended a device for pain management because physical therapy was too expensive.

In December of 2012 or 2013, Plaintiff had bypass surgery at Ochsner Hospital in New Orleans, Louisiana. He claims that because of the surgery, he must be on medications and monitored for the remainder of his life.

From April 16, 2018 until August 6, 2018, Plaintiff was incarcerated at Elayn Hunt Correctional Center. He claims he was assigned a bottom bunk with no climbing and no lifting of more than 15 pounds. He claims his blood test showed that he had a high PSA count and he was referred to a specialist. He claims the specialist recommended a second test. He claims the second test showed a lower PSA count but was still above normal. Plaintiff claims he was told that the tests could indicate the early stage of cancer or be nothing. He claims the specialist told him he could do another blood test or exploratory surgery. Plaintiff claims he chose to do another blood test but was transferred to David Wade Correctional Center on August 6, 2018 before the test was done.

Plaintiff claims that after he arrived at David Wade Correctional Center, he was told he would be transferred to the general population as soon as a bed was available. He claims he was forced to live in a cell in N-1 Southside on lockdown for nine weeks without due process. He claims he did not violate any rules or regulations. Plaintiff claims that during the nine weeks he was incarcerated in administrative segregation, he was denied access to Islamic Studies and Friday prayer call in violation of his First Amendment rights.

Plaintiff claims that because he was on the N-1 tier, he was only allowed one phone call per week. He claims he called his wife on August 12, 2018 and was only allowed ten minutes to speak to her. He claims that when he attempted to call his mother on August

18, 2018, he was denied because he had already had his one call for the week. He claims his mother died on August 18, 2018, and he was not able to hear her voice one last time.

Plaintiff claims David Wade Correctional Center is a disciplinary facility. He claims he has never had any disciplinary issues. He claims his placement in administrative segregation which limited his privileges was a violation of his federal and constitutional rights of due process. He claims he is from the New Orleans/Kenner area and David Wade Correctional Center is out of his home geographical area. He claims he is unable to have visitation without enduring a financial hardship.

Plaintiff claims that on August 6, 2018, he was seen by the duty nurse in the DWCC Southside Clinic. He told the medical staff his medical history, about the pains in his heart area, and his acute chronic back condition. He also told the nurse about his medications. The nurse checked his vital signs.

Plaintiff claims that on August 10, 2018, he submitted a sick call form for his chronic conditions. He claims he had sharp pains under his left arm and on the left side of his chest. He claims he also had lower back pain. He claims he was seen by Nurse Jeffery Jackson who examined him at his cell in front of his cellmate. He claims this was a violation of the Patient Privacy Act. He claims Nurse Jackson asked him about his medical history and his family's medical history. He claims Nurse Jackson told him that the doctor would see him the following the week. He claims he was not provided with medication or physical therapy. Plaintiff claims he was charged $3.00 to see Nurse Jackson.

Plaintiff claims he was finally seen on August 23, 2018 by Dr. Fuller. He claims he told Dr. Fuller his medical history including his need for a TENS unit or some type of

physical therapy. Plaintiff claims Dr. Fuller told him that was not available at the facility. He claims he then informed Dr. Fuller about his heart condition and the sharp pains he had under his left arm and his chest near the heart area. Plaintiff claims that without examining him, Dr. Fuller told him that he did not have heart trouble. He claims Dr. Fuller then listened to his heart and lungs. He claims he then told Dr. Fuller about his PSA levels. He claims Dr. Fuller told him that he would send him to a specialist. Plaintiff claims he finally saw the specialist on October 10, 2018.

Plaintiff was seen by a nurse in September of 2018. The nurse checked his vitals and asked if he was taking his medication. He told the nurse that he was and then asked about treatment for his back condition. He claims the nurse told him that he was at chronic care and they only treated conditions that could kill a person. He also left a urine sample.

Plaintiff claims that on September 24, 2018, he submitted a sick call request because of lower back pain. He claims he was not given medication or physical therapy. He claims he was charged $3.00 to see a nurse and $2.00 for each prescription. He claims he was not provided new medication. He claims the nurse told him that she would inform the doctor, but he was never seen by a doctor for this sick call.

Plaintiff claims that on September 25, 2018, he asked about his medications being changed, refilled, and not receiving his evening medications. He claims he did not see the medical staff on this day but was charged $3.00 to ask a question about his medications.

Plaintiff claims that on October 19, 2018, he saw a urologist at Ochsner LSU Hospital. He claims his vitals were checked. He told the urologist his medical history. He also explained to the urologist about his PSA level being high and that he wanted a third

blood test before he had a biopsy. He claims the urologist agreed that the new blood test could come back normal.

Plaintiff claims that on October 30, 2018, he saw a urologist at LSU Hospital. He was told that his test levels were still high. Plaintiff had a biopsy and was given pain medication.

Plaintiff claims that in November of 2018, he saw a urologist at Ochsner LSU Hospital. He claims he was told that he had prostate cancer. He was told that the cancer would not spread overnight and that if he were transferred, he should inform the staff that he needed to be seen every six months and biopsied once a year.

Plaintiff claims that in December of 2018, he saw the duty nurse in the DWCC Northside Infirmary. He was seen in the chronic care clinic and told to leave a urine sample. He claims his vitals were checked.

Plaintiff claims that on January 29, 2019, he saw Nurse Aimee in the DWCC Northside Infirmary for lower back pain. He claims Nurse Aimee stated that she would tell the doctor. His vitals were also checked. He claims he was not seen by the doctor but admits that several days later he was given a set of exercises to help stretch.

Plaintiff claims the doctors at David Wade Correctional Center did not start him on any new medications. He claims the failure to provide him with necessary treatments could and/or will cause his conditions to worsen. He also claims that he was denied medication and treatment for which he paid. He claims Dr. Fuller disregarded his health and safety by not providing him needed medical treatment. He claims Dr. Fuller discontinued his back pain medication without examining him for back problems. He claims that because of Dr.

Fuller's failure, he was assigned to the field crew. He claims the field crew is currently idled because of the death of an inmate. Plaintiff claims he should have been transferred to Elayn Hunt for medical treatment.

Plaintiff claims he should have been seen by a specialist and/or tested for heart issues and seen by a specialist for disc issues that caused him acute chronic pains. He claims he has been denied medications, surgery, and physical therapy for his conditions. He claims he should have received some form of pain management.

Plaintiff claims the DOC is harboring malice towards him because he filed a lawsuit in the Louisiana 19th Judicial District Court. He claims the DOC sent him to a disciplinary facility, removed his adjusted date from his rap sheet, charged him for medical services, failed to provide him medication, and assigned him to the field crew.

Accordingly, Plaintiff seeks injunctive relief, medical treatment, a transfer to Elayn Hunt Correctional Center, fines for Defendants' negligent conduct, monetary compensation and damages, and court costs and fees.

## LAW AND ANALYSIS

**Classification Claim**

Plaintiff complains that when he arrived at David Wade Correctional Center, he was placed on administrative segregation for nine weeks until a bed became available in general population. He claims he did not violate any rules or regulations. This is not a claim that this court can resolve. Federal courts should not, under the guise of enforcing constitutional standards, assume the superintendence of state prison administration. See

Jones v. Diamond, 636 F.2d 1364, 1368 (5th Cir. 1981) (en banc) (overruled on other grounds). Thus, this court accords state prison administrators wide-ranging deference to adopt and to execute policies and practices that are needed to maintain and preserve order, discipline, and security in prison. See Bell v. Wolfish, 441 U.S. 520, 547 (1979).

The classification of prisoners is such a practice that is left to the discretion of prison officials. See McCord v. Maggio, 910 F.2d 1248, 1250 (5th Cir. 1990). "It is well settled that '[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status'." McCord, 910 F.2d at 1250 (quoting Wilkerson v. Maggio, 703 F.2d 909 (5th Cir. 1983)).

In Louisiana, the classification of prisoners is the duty of the Department of Corrections and an inmate, such as Plaintiff, has no right to a particular classification. In addition, "speculative, collateral consequences of prison administrative decisions do not create constitutionally protected liberty interests." Luken v. Scott, 71 F.3d 192, 193 (5th Cir. 1995) (citing Meachum v. Fano, 427 U.S. 215, 299 n.8, 96 S. Ct. 2532, 2540 n.8 (1976)). Accordingly, Plaintiff's claim regarding his classification is frivolous because it lacks an arguable basis in law and in fact, and it should be dismissed with prejudice as frivolous.

**Religion Claims**

Plaintiff claims that during the nine weeks he was incarcerated in administrative segregation, he was denied access to Islamic Studies and Friday prayer call. "The Constitution requires that 'reasonable opportunities must be afforded to all prisoners to exercise ... religious freedom.'" Green v. McKaskle, 788 F.2d 1116, 1126 (5th Cir. 1986)

(quoting Cruz v. Beto, 405 U.S. 319, 322 (1972)). "The Supreme Court has also determined that the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1, protects the rights of prisoners who are unable to freely attend to their religious observances and who are dependent on the government's permission and accommodation to do so." McAllister v. Strain, 2009 WL 500560, (E.D. La. Feb. 25, 2009) (citing Cutter v. Wilkinson, 544 U.S. 709, 721 (2005)).

Inmates do retain some protections afforded by the First Amendment and RLUIPA, however the rights of all inmates are restricted. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted). The appropriateness of limiting inmates' First Amendment rights "arise[s] both from the fact of incarceration and from valid penological objectives--including deterrence of crime, rehabilitation of prisoners, and institutional security." Id.

Courts must afford deference to the judgment of prison administrators and their evaluation of these valid penological objectives. Id. at 349; Cutter, 544 U.S. at 717. When the actions of prison officials impinge on inmates' constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests." Id.

In his complaint and amended complaints, Plaintiff "has not identified any restriction imposed, or an action by a prison official, which would constitute a substantial burden on his free exercise of his religion." McAllister, 2009 WL 500560, at 4 (E.D. La. Feb. 25, 2009) (citing Baranowski v. Hart, 486 F.3d 112, 124 (5th Cir. 2007). Prison

officials' denial of Plaintiff's access to Islamic Studies and Friday prayer call while he was housed in administrative segregation created no constitutional violations. The prohibitions serve the legitimate penological interests of maintaining institutional security and deterring conduct, either by Plaintiff or by others against Plaintiff, that poses a threat to security. The restrictions did not constitute a substantial burden on Plaintiff's free exercise of his religion to such an extent that his limited First Amendment rights as a prisoner were violated.

Moreover, Plaintiff has not alleged he was restricted from exercising his religion in other ways, including through prayer. See Canell v. Lightner, 143 F.3d 1210, 1215 (9th Cir. 1998) ("relatively short-term and sporadic" interference with inmate's ability to pray not substantial burden on religious exercise); Clifton v. Lappin, 2010 WL 4136150 at 6 (W.D. La. Oct. 4, 2010), report and recommendation adopted, 2010 WL 4168271 (W.D. La. Oct. 18, 2010) ("Although [p]laintiff may not have been able to attend formal services during the lock down, he was certainly able to pray in his cell.") (citing Hamilton v. Schriro, 74 F.3d 1545, 1551 (8th Cir. 1996); Doty v. Williams, 995 F. Supp. 1081, 1083 (D. Ariz. 1998) (same) (citing O'Lone, 482 U.S. at 352).

Finally, to the extent Plaintiff's complaint may be liberally construed to raise an equal protection claim, he has again failed to state a claim upon which relief may be granted. To state an equal protection claim under § 1983, Plaintiff must show that "the governmental action in question classif [ies] or distinguish[es] between two or more relevant persons or groups [,] ... or ... impermissibly interferes with a fundamental right." Edwards v. Johnson, 209 F.3d 772, 780 (5th Cir.2000) (internal quotations and citations

omitted). Plaintiff must specifically demonstrate that prison officials acted with a discriminatory purpose. Woods v. Edwards, 51 F.3d 577, 580 (5th Cir.1995). "Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." Id.; Edwards v. Johnson, 209 F.3d at 780.

Although plaintiff may be a member of an identifiable group within the prison, he has failed to demonstrate that the policy or practice complained of was enacted with any discriminatory purpose. See Muhammad v. Lynaugh, 966 F.2d 901, 903 (5th Cir.1992) (finding no constitutional violation where plaintiffs were "given the same reasonable opportunity to practice their faith as that provided other religious groups"). Because Plaintiff has failed to show a violation of his individual constitutional rights or a violation of the rights of all Muslim inmates to practice their religion, his equal protection claim (to the extent that such a claim has been asserted) has no merit. Hewitt v. Henderson, 07-839, 2007 WL 3120056, at 4 (W.D. La. Sept. 6, 2007). Accordingly, Plaintiff fails to state a claim upon which relief might be granted because no constitutional violation has occurred.

**Telephone Limitations**

Plaintiff claims he was only allowed one telephone call per week while housed in administrative segregation. He claims that on August 12, 2018, he was only allowed to speak to his wife for ten minutes. He claims he was not allowed to call his mother on August 18, 2018 because he had already made his one phone call for the week. He claims his mother died that day and he was not able to hear her voice one last time.

Prisoners have "'no right to unlimited telephone use.' Instead, a prisoner's right to telephone access is 'subject to rational limitations in the face of legitimate security interests of the penal institution.'" Waganfeald v. Gusman, 674 F.3d 475 (5th Cir. 2012) (quoting Douglas v. Gusman, 567 F.Supp.2d 877, 886 (E.D. La. 2008)); Washington v. Reno, 35 F.3d 1093, 1100 (6th Cir. 1994); Benzel v. Grammer, 869 F.2d 1105, 1108 (8th Cir. 1989); Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986)). "Prisons legitimately impose a variety of restrictions on inmates' use of telephones." Roy v. Stanley, 2005 WL 2290276, *7 (D.N.H. Sept. 20, 2005) (citing United States v. Lewis, 406 F.3d 11, 13 (1st Cir. 2005); Gilday v. Dubois, 124 F.3d 277, 293 (1st Cir. 1997); Spurlock v. Simmons, 88 F.Supp.2d 1189, 1193 (D. Kan. 2000)).

Prison regulations concerning telephone use do not violate an inmate's First Amendment rights so long as the inmate does not suffer from an inability to communicate with the courts, counsel, family and friends. Hill v. Estelle, 537 F.2d 214, 215 (5th Cir.1976). Although Plaintiff claims he was unable to communicate with his mother one last time, he admits that he was allowed to use the telephone once a week. Plaintiff does not claim that he was unable to communicate with his family through mail. Accordingly, Plaintiff's claims regarding telephone use are frivolous because they lack an arguable basis in law and in fact, and they should be dismissed with prejudice as frivolous.

**Place of Incarceration Claims**

Plaintiff claims he should not have been incarcerated at David Wade Correctional Center. He argues that DWCC is a disciplinary facility, and he has not had disciplinary

issues. He is from Kenner, Louisiana and claims DWCC is out of his home geographical area and visitation causes a financial hardship. The Supreme Court has held that it is for state prison authorities to decide where a state prisoner is to be incarcerated, and that a prisoner has no right to challenge his place of incarceration. See Olim v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Under Olim and Meachum, Plaintiff has no right to challenge his incarceration at David Wade Correctional Center. Accordingly, Plaintiff's claims regarding his place of incarceration are frivolous because they lack an arguable basis in law and in fact, and they should be dismissed with prejudice as frivolous.

**Medical Claims**

Plaintiff claims he was denied adequate medical treatment. Plaintiff filed this claim pursuant to 42 U.S.C. § 1983 of the Civil Rights Act which provides redress for persons "deprived of any rights, privileges or immunities" by a person acting under color of state law. The right protected under 42 U.S.C. § 1983 in matters which concern alleged denial of, or inadequate medical care is the Eighth Amendment prohibition against cruel and unusual punishment.

The lack of proper inmate medical care rises to the level of a constitutional deprivation under the Eighth Amendment of the United States Constitution only if the evidence shows that the prison officials showed "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976); See also Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 1978 (1994). It is only deliberate indifference, "an unnecessary and wanton infliction of pain" or an act "repugnant to the

conscience of mankind," that constitutes conduct proscribed by the Eighth Amendment. Estelle, 429 U.S. at 105-06, 97 S. Ct. at 292; See also Gregg v. Georgia, 428 U.S. 153, 96 S. Ct. 2909 (1976). Further, the plaintiff must establish that the defendants possessed a culpable state of mind. See Wilson v. Seiter, 501 U.S. 294, 297-302, 111 S. Ct. 2321, 2323-27 (1991); Farmer, 511 U.S. at 838-47, 114 S. Ct. at 1979-84. A delay in medical care will violate the Eight Amendment only if the delay is based on deliberate indifference and results in substantial harm. Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993). In addition, disagreement with the diagnostic measures or methods of treatment afforded by prison officials does not state a claim for Eighth Amendment indifference to medical needs. See Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997).

After a thorough review of Plaintiff's complaint, read in a light most favorable to him, the court finds that the facts alleged do not support a finding of deliberate indifference to serious medical needs. To the contrary, the record demonstrates that Defendants were attentive to the medical needs of Plaintiff. It has been consistently held that an inmate who has been examined by medical personnel fails to set forth a valid showing of deliberate indifference to serious medical needs. Norton v. Dimazana, 122 F.2d 286, 292 (5th Cir. 1997); Callaway v. Smith County, 991 F. Supp. 801, 809 (E.D. Tex. 1998); Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985); Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

Plaintiff was seen in the clinic by the duty nurse on August 6, 2018 and the nurse checked his vital signs. Plaintiff was examined by Nurse Jeffery on August 10, 2018 for his chronic conditions. Plaintiff was seen by Dr. Fuller on August 23, 2018. Dr. Fuller listened to his heart and lungs. Dr. Fuller referred Plaintiff to a specialist for his prostate

issues. In September of 2018, Plaintiff was seen by a nurse who checked his vitals and collected a urine sample. On September 24, 2018, Plaintiff saw a nurse for lower back pain and was given prescriptions for medications. Plaintiff saw a specialist for his prostate on October 10, 2018. He again saw a urologist on October 19, 2018. His vitals were checked, and bloodwork was performed. Plaintiff saw the urologist on October 30, 2018. He was biopsied based on his bloodwork results and given pain medication.

In November of 2018, Plaintiff saw a urologist who informed him that he had prostate cancer. The urologist told him he needed to be checked every six months and biopsied once a year. In December of 2018, Plaintiff was seen by the duty nurse. His vitals were checked, and a urine sample was collected. On January 29, 2019, Plaintiff saw Nurse Aimee for lower back pain and his vitals were checked. Several days later he was given exercises to help him stretch. Plaintiff was provided with a regular with restrictions duty status from August 23, 2018 until February 23, 2019. Plaintiff's complaint is devoid of factual allegations that would tend to show Defendants acted with a culpable state of mind or that their actions were "unnecessary and wanton."

Plaintiff disagrees with the treatment Defendants provided him. He claims he was not provided with surgery, pain management, new medications, physical therapy, and/or a TENS unit for his chronic conditions. He claims Dr. Fuller discontinued his back pain medication. He also claims he should have seen a doctor instead of a nurse at his sick call visits. He claims he should have seen a specialist for his heart and disc problems. He claims his heart should have been tested. As previously discussed, disagreement with the

diagnostic measures or methods of treatment afforded by prison officials does not state a claim for Eighth Amendment indifference to medical needs.

Plaintiff's allegations, if accepted as true, may amount to a state law claim for negligence, a tort. However, mere negligence, neglect or medical malpractice does not amount to a denial of a constitutional right as these actions on the part of Defendants do not rise to the level of a constitutional tort. See Daniels v. Williams, 474 U.S. 327, 329-30, 106 S. Ct. 662, 664 (1986); Estelle, 429 U.S. at 106, 97 S. Ct. at 292; Lewis v. Woods, 848 F.2d 649, 651 (5th Cir. 1988). The fact that Plaintiff does not believe that his medical treatment was as good as it should have been is not a cognizable complaint under the Civil Rights Act. See Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). Prisoners are not constitutionally entitled to the best medical care that money can buy. See Mayweather v. Foti, 958 F.2d. 91 (5th Cir. 1992). Accordingly, Plaintiff's medical care claims should be dismissed with prejudice as frivolous.

**Medical Fee Claims**

Plaintiff claims that on August 10, 2018 he was charged $3.00 to see Nurse Jackson. He claims that on September 24, 2018 he was charged $3.00 to see a nurse and $2.00 for each prescription. Plaintiff claims that on September 25, 2018, he was charged $3.00 to ask a question about his medications.

Plaintiff does not have a constitutional right to free medical care. Hutchinson v. Belt, 957 F.Supp. 97 (W.D. La. 1996) (citations omitted). Furthermore, Plaintiff does not allege that he was denied medical treatment because he could not pay the fee.

Accordingly, Plaintiff's medical fee claims should be dismissed with prejudice as frivolous.

**Privacy Claims**

Plaintiff complains that on August 10, 2018, he was examined at his cell door in front of his cellmate and the nurse asked him about his medical history. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Plaintiff makes no showing that the examination or questioning in front of his cellmate violated the Constitution and laws of the United States. There is a consensus among the United States Courts of Appeal that prisoners have no absolute constitutional right in the privacy of their medical records. See Walker v. Gerald, 2006 WL 1997635 (E.D.La.2006) and the cases cited therein.

To the extent that plaintiff might imply a right and cause of action pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. No. 104-191, §§ 261-264, 110 Stat.1936 (1996), his claim also fails. HIPAA is the federal statute which provides for confidentiality of medical records. However, as further noted in Walker v. Gerald, "... HIPAA provides no express or implied private cause of action for its violation ..." Walker, *6 and cases cited therein.

"Prisoners cannot enjoy greater privacy protection than individuals in free society, and some amount of sharing of medical information in areas where it might be overheard by other patients-e.g., in hospital emergency rooms, school infirmaries, and the waiting

room of a doctor's office-is commonplace." Franklin v. McCaughtry, 110 Fed. Appx. 715, 719 (7th Cir. Sept.7, 2004) (citations omitted). Plaintiff's only complaints are he was examined and asked about his medical history at his cell in front of his cell mate. There is no clearly defined law which would require the nurse to examine and question Plaintiff in a particular setting or in extreme privacy. Furthermore, Plaintiff has not alleged that he suffered any harm or that any of his medical information was used against him by his cellmate inmate. See Patin v. LeBlanc, CIV.A. 11-3071, 2012 WL 3109402, at 21 (E.D. La. May 18, 2012), report and recommendation adopted, 2012 WL 3109398 (E.D. La. July 31, 2012). Accordingly, Plaintiff's medical privacy claims should be dismissed with prejudice as frivolous.

**Conclusory Claims**

Plaintiff claims prison officials are harboring malice towards him because he filed a lawsuit in state court. He claims he was transferred to a disciplinary facility, his adjusted date was removed from his rap sheet, he was charged for medical services, denied medication and assigned to the field crew.

A Section 1983 plaintiff has long been required to plead his case with "factual detail and particularity," not mere conclusory allegations. Elliot v. Perez, 751 F.2d 1472, 1473 (5th Cir. 1985); Hale v. Harney, 786 F.2d 688 (5th Cir. 1986). The Supreme Court has abolished this heightened pleading standard for claims against municipalities, Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160 (1993), but the requirement remains firmly in place for claims against individual public officials. See Schultea v. Wood, 47 F.3d 1427 (5th Cir.1995) (en banc).

Plaintiff has named individual prison officials as defendants and is therefore required to give factual details regarding his alleged constitutional rights violations. Plaintiff has failed to do so as to these claims. Furthermore, to state a claim of retaliation an inmate must allege the violation of a specific constitutional right and be prepared to establish that, but for the retaliatory motive, the complained of incident – transfer to a disciplinary facility, adjusted date removed from rap sheet, charges for medical services, denial of medication, and assignment to the field crew -would not have occurred. Woods v. Smith, 60 F.3d 1161 (5th Cir. 1995), citing Mt. Healthy City School Board District Bd. Of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The retaliatory motive alleged by Plaintiff is entirely conclusory as he provides no specific allegations showing that "but for" this motive the transfer to a disciplinary facility, adjusted date removed from rap sheet, charges for medical services, denial of medication, and assignment to the field crew would not have occurred. Accordingly, these claims should be dismissed for failure to state a claim on which relief may be granted.

## CONCLUSION

Because Plaintiff is a prisoner, this court may dismiss the complaint before or after service of process, and before or after answers have been filed, if it finds the complaint "frivolous" or if it "fails to state a claim upon which relief may be granted". See 28 U.S.C. § 1915A; See Martin v. Scott, 156 F.3d 578, 579-80 (5th Cir. 1998), cert. denied, 527 U.S. 1041 (1999).

For the reasons heretofore stated, the court finds that the complaint based upon a violation of Plaintiff's civil rights lacks an arguable basis in law and fact and is frivolous.

Accordingly;

**IT IS RECOMMENDED** that Plaintiff's complaint be **DISMISSED WITH PREJUDICE** as frivolous and for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii).

## OBJECTIONS

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendations set forth above, within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking, on appeal, the proposed factual findings and legal conclusions that were accepted by the district court and that were not objected to by the aforementioned party. See Douglas v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

**THUS DONE AND SIGNED**, in chambers, in Shreveport, Louisiana, on this 12th day of October, 2021.

Mark L. Hornsby
U.S. Magistrate Judge